IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

G.W. DELANEY and
PHYLLIS DELANEY                                                    PLAINTIFFS

v.                                    Civil No. 6:05-cv-6045


GARY ASHCRAFT, Chief
of Police in his official and
individual capacity, et al                                         DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On March 9, 2007, separate Defendants the City of Hot Springs, Arkansas, Gary Ashcraft, and

Paul Norris filed a motion for summary judgment (Doc. #279).  On March 12, 2007, the motion was

referred to the undersigned for report and recommendation (Doc. #282).  On March 30, 2007, the

Plaintiffs G.W. Delaney and Phyllis Delaney responded to the motion (Doc. #286).  On April 2, 2007,

the Plaintiffs filed a supplement to the response and their brief in support of their response (Doc. 288

and Doc. 289).   On April 13, 2007, the separate Defendants filed their Supplemental Brief in Support

of Motion for Summary Judgement.  (Doc. 292).   This matter is now ready for decision.

## 1.  BACKGROUND

This case was filed on June 23, 2005.  Plaintiffs' amended complaint was filed on May 12,

2006.  (Doc. #222).  Gary Ashcraft is the Chief of the Hot Springs Police Department.  Paul Norris

is a detective with the Hot Springs Police Department.  Gary Ashcraft, the City of Hot Springs, and

Paul Norris, will be collectively referred to as the Movants.

Plaintiffs assert Movants violated the their rights in connection the events surrounding a

custody dispute over a minor child, Makayla. Plaintiffs assert federal claims against Movants under

Title 42 U.S.C. §§ 1983 and 1985.  Plaintiffs also bring supplemental state law claims of malicious prosecution, intentional infliction of emotional distress, abuse of process and defamation.

According to the petition for custody filed in the Warren Circuit Court, Division III, in the Commonwealth of Kentucky, the minor child Makayla Delaney, resided with the Plaintiffs since February of 1999 when she was approximately one month old.  *Plaintiffs' Exhibit* 1 at page 48.  The petition indicates Plaintiffs originally believed that the child was their granddaughter; However, Plaintiffs learned through paternity testing that their son was not the father of the child.  *Id.* at page 49 & 52.  Kellie Allen is Makayla's biological mother.  *Id.* at page 49.

David Burton, and his parents, Michael and Claudia Burton, also sought custody of Makayla.  *Plaintiffs' Exhibit* 1 at pages 61-64.  On January 31, 2002, the Warren Circuit Court, Division III, Family Court, for the Commonwealth of Kentucky, entered an order naming Plaintiffs the permanent sole custodians of Makayla.  *Plaintiffs' Exhibit* 1 pages 2-4.

It is not clear from the documents before the court when Makayla was taken to Garland County, Arkansas, by Phyllis Delaney's sister, Diane Browning.  Both the Plaintiffs and Browning, in materials filed in state court[1], have maintained they have had custody of Makayla virtually from her birth in February of 1999.  What is clear is that a custody battle ensued between the Plaintiffs and Browning.  It is this custody battle and the events that took place during it that ultimately resulted in the filing of this lawsuit.

On February 15, 2002, Browning filed a petition for custody and emergency *ex-parte* relief in the Circuit Court of Garland County, Domestic Relations Division.  *Plaintiffs' Exhibit* 2 at page 1.  In the petition, Browning asserted Makayla had been in her physical custody since her birth on January

---

[1]Plaintiff's originally filed custody proceedings in Kentucky state court.  Browning filed a custody proceeding in Arkansas state court.

-2-

27, 1999.  *Id.*  Browning further asserted that Makayla had resided continuously in Arkansas since her birth.  Browning alleged in the state court proceeding that the Plaintiffs had procured an order of custody out of the State of Kentucky under false and misleading pretenses.  *Id.*  The petition attached the September 28, 2001, order entered by the Warren Circuit Court appointing Plaintiffs as *de facto* custodians of Makayla.  *Id.* at pages 3-4.

By affidavit, Browning asserted she had been the physical custodian of Makayla for the past two and one-half years.  *Plaintiffs' Exhibit* 2 at page 6.  Browning asserted that Phyllis Delaney[2] had traveled to Arkansas and attempted to remove Makayla from the state.  *Id.*  Browning also asserted that Phyllis was undergoing physical and mental problems for the past year and a half and that two of her children, age twenty-five, and twenty-one, had moved back to Arkansas because of threats of bodily harm from their mother.  *Id.*  Browning asked that the Plaintiffs be enjoined from removing Makayla from the State of Arkansas until a hearing could be had on the merits of the case.  *Id.*  The Arkansas petition was also supported by the affidavit of George Browning, Phyllis' brother.  *Plaintiffs' Exhibit* 2 at page 8.

An emergency *ex-parte* order was entered by the Garland County Circuit Court on February 15, 2002, ordering the Garland County Sheriff's Department, the Hot Springs Police Department, and any other law enforcement agency to assist Diane Browning in peacefully maintaining custody of Makayla.  *Plaintiffs' Exhibit* 2 at page 9.  Browning was granted emergency custody of Makayla.  *Id.* A hearing was scheduled for February 26, 2002.  *Id.*

Plaintiffs were personally served with the summons, petition, and emergency order at the Garland County Courthouse on February 15, 2002, by the Garland County Sheriff's Department.

---

[2]To avoid confusion, the court will occasionally refer to the individual Plaintiffs by their first names.

*Plaintiffs' Exhibit* 2 at pages 10-11.  Plaintiffs did not appear at the hearing scheduled for February 26, 2002.  *Plaintiffs' Exhibit* 2 at page 12.

An involuntary commitment proceeding was initiated by Browning in Garland County on February 15, 2002.  *Amended Complaint* (Doc. #222, Count 1, at ¶ 3).  Browning obtained an order of involuntary commitment for Phyllis Delaney.  *Id.*  Phyllis was released following an evaluation during which it was determined she did not meet the criteria for involuntary commitment.  *Id.*

Browning obtained a final order of custody of Makayla from the Garland County Circuit Court on February 27, 2002.  *Plaintiffs' Exhibit* 2 at page 12.  On March 7, 2002, Plaintiffs filed an answer to the petition for custody and emergency *ex-parte* relief.  *Plaintiffs' Exhibit* 2 at pages 15-16.  In Plaintiffs' answer they admitted paragraph one of the petition.  *Id.* at page 15.  Paragraph one of the petition asserted:  "That Petitioner [Diane Browning] has had physical custody of the minor child, Makayla Delaney, date of birth January 27, 1999, for the last two and one-half years."  *Id.*  However, Plaintiffs denied that they fraudulently obtained an order of custody, or that Makayla had lived continuously in Arkansas.  *Id.*  Plaintiffs also asserted Browning was informed of the fact that they were coming to Arkansas to pick Makayla up.  *Id.*

On May 22, 2002, Officer Tim Ragsdale of the Hot Springs Police Department was called to Kindercare Daycare, in Hot Springs, Arkansas, to investigate a possible child abduction.  *Movants' Exhibit* B at ¶ 3 & ¶ 4.  Ragsdale met with and interviewed the witnesses to the incident including Connie Scott, Debbie Ellsworth, Sheila Steir, Lucett Merworth, Paulette Keith, and Malcolm Perdue.  *Id.* at ¶ 6.  Browning also arrived at the scene with an order granting her custody of Makayla.  *Id.* at ¶ 7.

Ragsdale reduced the witness statements to narrative form in the pages of his incident report. *Movants' Exhibit* B at ¶ 8. Ragsdale did not coerce the witnesses to make any false statements and had no reason to believe the witnesses were lying or misrepresenting the facts of the incident. *Id.* at ¶ 10 & ¶ 11.

According to the narrative of Scott's statement, Scott informed Ragsdale that the Plaintiffs came into the daycare and informed Scott that they had a three year old child they were considering placing in the daycare and wanted to see facility including the classroom. *Exhibit* 1 at page 1 attached to *Movants' Exhibit* B. When G.W. saw Makayla he indicated he knew her and wanted to give her a hug. *Id.* When G.W. returned to the office with Scott, Phyllis remained behind in the room with teachers Debbie Ellsworth and Sheila Steir. *Id.* Phyllis then started to leave with Makayla. *Id.* Scott and the teachers attempted to stop the Plaintiffs from removing Makayla from the facility. As the group made its way outside and Phyllis knocked Scott down hurting Scott's left elbow and left leg. *Id.* The Plaintiffs then left with Makayla in a Cadillac. *Id. See also Movants' Exhibit* C (Affidavit of Connie Scott).

Lucett Merworth reported attempting to stop Phyllis as she was getting in the car in an effort to leave with Makayla. *Exhibit* 1 at page 3 to *Movants' Exhibit* B. Merworth was pushed out of the way by G.W. and as G.W. started to drive off he grabbed Merworth's right arm and held on. *Id.* When G.W. finally let go of Merworth's arm, she twisted her ankle. *Id.* Merworth's own three years old child was knocked down by Phyllis when she opened the classroom door. *Id.* The child was not hurt. *Id.*

Paulette Keith indicated she had observed the Plaintiffs leaving with Makayla. *Exhibit* 1 at page 3 to *Movants' Exhibit* B. According to Keith, when Plaintiffs left the parking area, they struck Keith's vehicle. *Id.*

Malcolm Perdue was across the street when he heard a lot of "hollering." *Exhibit* 1 at page 4 to *Movants' Exhibit* B. Perdue saw a black male with a child and women attempting to stop the black male from leaving the daycare center with the child. *Id.* The black male entered a Cadillac, backed over some bushes, and drove off over the grass towards Emory Street. *Id.*

Debbie Ellsworth stated the Plaintiffs came in for a tour of the daycare facility. *Exhibit* 1 at page 4 to *Movants' Exhibit* B. Shortly after the black female left the room with the child, Ellsworth called 911. *Id.* Ellsworth along with Steir then attempted to stop the Plaintiffs from taking the child but could not. *Id.* *See also Movants' Exhibit* D (Affidavit of Debbie Ellsworth).

Sheila Steir indicated the black female was talking to the child. *Exhibit* 1 at page 4 to *Movants' Exhibit* B. When Ellsworth asked if the child could go with the black female, Steir replied no and she went outside to assist. *Id.* Steir saw Scott on the ground and the vehicle left with the child. *Id.* *See also Movants' Exhibit* E (Affidavit of Sheila Steir).

Browning stated that the Plaintiffs were Makayla's grandparents and had no legal custody. *Exhibit* 1 at page 3 attached to *Movants' Exhibit* B. Browning presented a final custody order from the Garland County Circuit Court, Case No. 2002-151-II, signed by Judge Vicki Cook on February 22, 2002, showing that Browning was the legal guardian. *Id.* *See also Movants' Exhibit* F (Final Order of Custody entered on February 27, 2002, by the Circuit Court of Garland County, Domestic Relations Division, granting Diane Browning permanent Custody of Makayla).

Detective Paul Norris was also called to Kindercare to investigate the possible child abduction. *Movants' Exhibit* A at ¶ 3 & ¶ 4. When Norris arrived, he met with Officer Tim Ragsdale who had initially responded to the call. *Id.* at ¶ 5. Browning was at the scene and informed Norris that the Plaintiffs had abducted Makayla and that Browning had been granted permanent custody of Makayla.

-6-

*Id.* at ¶ 6. Ragsdale obtained witness statements from Connie Scott, Paulette Keith, Lucett Merworth, Malcolm Perdue, Sheila Steir, and Debbie Ellsworth. *Movants' Exhibit* A at ¶ 7.

The following day, Norris contacted Connie Scott, the manager of Kindercare. *Movants' Exhibit* A at ¶ 8; *Plaintiffs' Exhibit* 3 (deposition page 6). Norris reduced Scott's statements to a witness narrative. *Exhibit* 1 attached to *Movants' Exhibit* A. The narrative provides as follows:

> Connie said two people came to the facility identifying themselves to her as G.W. Delaney and Phyllis Delaney and asked for a tour of the day care. She said they told her they had a three year old child and were looking for a day care for the child. Connie said she talked to them for several minutes before they asked to see a class room. She said once in the class room G.W. told her he knew this child's aunt, picked up the child and gave the child a hug. The child was Makaila Allen/Delaney. Connie said the child was somehow passed to Phyllis and she was heading toward the door. She said she tried to stop her but Phyllis pushed down causing minor injuries to her arm, back and leg. Connie said several of the other people, especially Lucett Merworth, also tried to stop them. She said once they made their was to the car Lucett was trying to get the child from the driver's side. She said the driver's door was open and G.W. had one leg still outside the car and Lucett was part way inside the car trying to get the child. Connie said she was behind the car, coming around to help Lucett, when G.W. shifted the car into reverse and accelerated backwards causing her to have to jump out of the way. She said when he shifted into a forward gear and accelerated while still holding onto Lucett's arm. Connie said when he finally let go Lucett fell causing her to twist an ankle.
>
> Connie said they called to police and told G.W. and Phyllis they were going to call the police and asked them to wait for the police. Connie said Phyllis told her to "Go ahead and call the police" but they left any way.

*Exhibit* 1 attached to *Movants' Exhibit* A.

Scott's statements were consistent to with the witness statements taken by Ragsdale on May 22nd. *Movants' Exhibit* A at ¶ 10 & ¶ 11. Norris did not coach Scott to lie or misstate the facts. *Id.* at ¶ 17. *See also Movants' Exhibit* C (Affidavit of Connie Scott).

Norris investigated the probate file concerning Makayla's custody and discovered Browning had been issued a permanent order of custody on February 27, 2002. *Movants' Exhibit* A at ¶ 12.

-7-

Norris had no reason to believe the order was invalid or that the witness statements contained any falsities. *Id.* at ¶ 13 & ¶ 16.

At his deposition, Norris testified he did remember talking to Browning but did not know what brought the conversation about. *Plaintiffs' Exhibit* 3 (deposition at page 6). In his mind, Browning was not a party to the incident he was investigating. *Id.*

The gist of Norris' investigation consisted of reviewing the case with Ragsdale at the scene, reviewing the material at Judge Cook's court, and interviewing Scott. *Plaintiffs' Exhibit* 3 (deposition at page 6-7). Norris initially testified he was not aware of the fact that there was a custody order in another state. *Plaintiffs' Exhibit* 3 (deposition at page 7). While there were some records from another state in the file, Norris testified he could only operate under the jurisdiction of the court in the State of Arkansas. *Id.* (deposition at page 19).

Based on his investigation, Norris completed a probable cause affidavit requesting an arrest warrant for the Plaintiffs for the crimes of aggravated assault, third degree battery, and interference with child custody. *Movants' Exhibit* A at ¶ 14 & ¶ 15; *Movants Exhibit* J (probable cause affidavit). Norris did not lie when completing the affidavit and included nothing he knew, or should have known to be false. *Movants' Exhibit* A at ¶ 19. Indeed the Plaintiffs do not allege any false statement in the probable cause affidavit, rather, they allege that Norris knew about the existence of a competing custody order issued by a state court in Kentucky.

On May 23, 2002, affidavits for warrants for the arrest of Plaintiffs for aggravated assault, interference with custody, and third degree battery were completed. *See Movants' Exhibit* H. The arrest warrants were issued the same day. *Id.*

-8-

On May 30, 2002, the Warren Circuit Court entered another order regarding custody of Makayla. *Plaintiffs' Exhibit* 1 at pages 5-8. The Warren Circuit Court noted that Browning, as Petitioner, had filed a petition for custody and emergency *ex parte* relief on February 15, 2002, in the Circuit Court of Garland County, Arkansas, No. R-2002-151, naming Plaintiffs as respondents, and failing to name the natural parents as indispensable parties. *Id.* The Warren Circuit Court noted the Arkansas Court had entered an emergency order granting Browning emergency custody of Makayla on February 15, 2002, and had entered an order for the immediate detention of Phyllis to determine if she was a danger to herself or others. *Id.* Following examination, it was determined Phyllis did not meet the criteria for involuntary commitment for psychological reasons. *Id.* The order further recited that on February 27, 2002, the Arkansas court entered a final order of custody of Makayla to Browning without the presentation of evidence by the Plaintiffs or communication with the Warren Circuit Court. *Id.*

The Warren Circuit Court found that pursuant to the Uniform Child Custody Jurisdiction Act, the Commonwealth of Kentucky was the home state of Makayla. *Id.* The Warren Circuit Court found that the Garland County Circuit Court had failed to comply with the provisions of the UCCJA and did not have jurisdiction. *Id.* The Warren Circuit Court therefore found the Plaintiffs should continue to be the permanent and sole custodians of Makayla. *Id.* It directed that Makayla remain in Kentucky and it finally ordered that the Plaintiffs not be detained or arrested for any perceived violation of any foreign custody orders regarding Makayla. *Id.*

On May 31, 2002, a certified copy of the Warren County Court order of custody was provided to the Garland County Circuit Court. *Plaintiffs' Exhibit* 2 at pages 17-22. Plaintiffs were arrested on June 9, 2002, by the Bowling Green Police Department in Bowling Green, Kentucky, on the Arkansas

warrants and released on June 10th. *Movants' Exhibit* K (amended complaint (Doc. #222) at ¶ 20); *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 96).

Plaintiffs assert they were arrested again in Kentucky on June 12, 2002, because Judge Coleman said they were in contempt of court. *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 96). Plaintiffs were released on a writ of *habeas corpus* on June 27, 2002. *Plaintiffs' Exhibit* 10. On August 13, 2002, Plaintiffs maintain they found out on their own that Hot Springs was not requesting their rendition. *Plaintiffs' Exhibit* 11 (letter dated July 22, 2002, from Terri Harris, Chief Deputy Prosecuting Attorney for the 18th Judicial District East, Hot Springs, Arkansas).

Plaintiffs maintain the Arkansas arrest warrants remained active in the Arkansas Crime Information Center (ACIC)/National Crime Information Center (NCIC) databases until August of 2003. *See Plaintiffs' Exhibit* 5.[3] Plaintiffs maintain it was up to the Hot Springs Police Department to verify the accuracy of the information it placed in the database and ensure the outstanding arrest warrant entries were removed once served.

Plaintiffs concede they did not show the daycare any documents indicating they had legal custody of Makayla or the right to remove her from the daycare facility. *Movants' Exhibit* 6 (Deposition of Phyllis Delaney at page 54 lines 12 to 19). However, Plaintiffs do assert, through affidavits, that G.W. told Scott that Browning had lied to obtain a bogus Arkansas custody order and the Plaintiffs were taking Makayla home to Kentucky whose courts properly had jurisdiction over the custody case. *Affidavit of G.W. Delaney* at ¶ 12 & ¶ 13. Plaintiffs state they did not recognize the Arkansas court order and the police had made it very clear that there was an order from Judge Cook

---

[3]Plaintiffs' exhibit 5 indicates the Hot Springs Police Department, Criminal Investigation Division, requesting officer, Paul Norris, completed warrant deletion forms on the third degree battery charge, the interference with child custody charge, and the aggravated assault charge against both Phyllis and Greg (G.W.) Delaney on June 12, 2002, because the warrants had been served. Warrant deletion forms were again completed on July 31, 2003, at Terri Harris' request.

and nothing was going to be done to assist Plaintiffs in working on the problems with the custody order. *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at pages 119-120).

## 2. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## 3. DISCUSSION

Movants contend they are entitled to judgment on all claims asserted against them. I will address the claims asserted by the Plaintiffs separately.

**A. Section 1983 claims**: Title 42 U.S.C. § 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the

Constitution and laws" of the United States.  "'[U]nder color of law' has consistently been treated as the same thing as 'state action' required under the Fourteenth Amendment." *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005)(citations omitted).  Actions are "under color of law" when undertaken by officers to perform their official duties whether they "hew to the line of their authority or overstep it." *Dossett*, 399 F.3d at 949 (citations and internal quotation marks omitted).

Movants first argue there are no facts to support Plaintiffs' contention that Norris intentionally, knowingly, or with reckless disregard, included false statements in the probable cause affidavit to procure the arrest warrants for the Plaintiffs.  Rather, Movants contend Plaintiffs rely solely on their unsupported speculations.  Second, Movants argue even if a constitutional violation occurred, Norris acting as a reasonable officer, would not have known that his actions violated Plaintiffs' clearly established Fourth Amendment rights.  Movants therefore contend Norris is entitled to qualified immunity.

A cause of action arises under § 1983 when an officer, either knowingly and intentionally, or with reckless disregard for the truth, includes a false statement within a warrant affidavit when with the false material set aside, the affidavit's remaining content is insufficient to establish probable cause. *See e.g., Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991).  The same analysis applies to omissions of fact.  A cause of action arises when:  (1) the facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and (2) the affidavit, supplemented by the omitted information, could not support a finding of probable cause. *United States v. Lueth*, 807 F.2d 719, 726 (8th Cir. 1986).  These causes of action arise out of the constitutional "guarantees of fourth and fourteenth amendments when the individual complains of an arrest,

-12-

detention, and prosecution without probable cause." *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992).

It is undisputed that Plaintiffs removed Makayla from Kindercare on May 22, 2002, *see Movants' Exhibit* K at ¶ 4 (the amended complaint (Doc. #222)), and that the police were called to the scene by Kindercare workers. It is undisputed the Plaintiffs did not provide Kindercare workers with a copy of a court order or any other document showing their entitlement to the custody of Makayla. *Movants' Exhibit* G (deposition of Phyllis Delaney at page 54); *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 74).

Plaintiffs maintained they could not leave Makayla there because they did not believe they would ever see her again. *See e.g., Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at pages 74-75). While the Plaintiffs' view of who caused, or was responsible for, the physical confrontation varies from that given by the witnesses, it is undisputed there was a physical confrontation of some type when the Plaintiffs attempted to remove Makayla from the daycare facility. *Id.* It is also agreed that the daycare workers attempted to stop Phyllis from getting into the Plaintiffs' vehicle and that the vehicle left the daycare by driving across the grass. *See e.g., Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 77-80).

It is undisputed the Plaintiffs then left the State of Arkansas and went to Bowling Green, Kentucky. *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 80). The Plaintiffs do not dispute they were aware of the Garland County Circuit Court order giving Browning full custody of Makayla. *Id.* (deposition of G.W. Delaney at page 82). Plaintiffs state they believed the Garland County court order was invalid and that law enforcement officers would not assist them in regaining custody of Makayla.

-13-

Plaintiffs agree there is no evidence Norris instituted the criminal process against them with malice, conspired with other named defendants, or asked any witnesses to make false statements. *See e.g., Movants' Exhibit* L (deposition of G.W. Delaney at pages 83-85, 128).   Plaintiffs base their § 1983 claim on the "inconsistent statements taken" by Ragsdale and the probable cause affidavit drafted by Norris. *Plaintiffs' Exhibit* 4 (deposition of G.W. Delaney at page 83).  When asked to explain what he meant by "inconsistent statements," G.W. referred to the fact that one witness indicated G.W. was in the office, one said G.W. was in the room, one said the front door of the car was open on the driver's side, one said the back door was open, one referred to small dents in Keith's car, while one said Keith's car was rammed. *Id.*  (deposition of G.W. Delaney at page 84).

Ragsdale interviewed the witnesses, Scott, Steir, Keith, Ellsworth, Perdue, and Merworth. Their statements were reduced to narrative form and incorporated into Ragsdale's report.  That day, Browning provided Ragsdale with a copy of  a final custody order for Makayla.  Norris reviewed Ragsdale's report and followed up the following day by interviewing Scott.  Norris also verified the existence of the final custody order entered by the Garland County Circuit Court.  He then completed the probable cause affidavit asking that a warrant be issued charging each of the Plaintiffs with the interference with the custody of a minor child in violation of Ark. Code Ann. § 5-26-502, aggravated assault in violation of Ark. Code Ann. § 5-13-204, and battery in the third degree in violation of Ark. Code Ann. § 5-13-203.   Plaintiffs do not contend that Norris made a false statement in the probable cause affidavit.

Section 5-26-502 provides that a person commits the offense of interference with court-ordered custody if the person:  "Knowing that he or she has no lawful right to do so, takes, entices, or keeps any minor from any person entitled by a court decree or order to the right of custody of the minor."

Ark. Code Ann. § 5-26-502(a)(1) (2002).  Section 5-13-204 provides that a person commits the

crime of aggravated assault if:  "under circumstances manifesting extreme indifference to the value

of human life, he purposely engages in conduct that creates a substantial danger of death or serious

physical injury to another person."  Ark. Code Ann. § 5-13-204 (2002).

> Section 5-13-203 provides that a person commits the crime of third degree battery if:
> (1) With the purpose of causing physical injury to another person, the person causes
> physical injury to any person;
> (2) The person recklessly causes physical injury to another person;
> (3) The person negligently causes physical injury to another person by means of a
> deadly weapon; or
> (4) The person purposely causes stupor, unconsciousness, or physical or mental
> impairment or injury to another person by administering to the other person, without
> the other person's consent, any drug or other substance.

Ark. Code Ann. § 5-13-203 (2002).

The Parental Kidnaping Prevention Act (PKPA), 28 U.S.C. § 1738A, requires state courts

to give full faith and credit to custody determinations of other states and was enacted to discourage

parental kidnaping across state lines within the United States.  *See e.g., Holder v. Holder,* 305 F.3d

854, 866 (9th Cir. 2002).  No private right of action is created in federal court by the PKPA.  *See*

*Thompson v. Thompson*, 484 U.S. 174, 108 S. Ct. 512, 98 L. Ed. 2d 512  (1988)(no implied private

cause of action in the PKPA to determine which of two conflicting state custody decrees is valid).

Arkansas adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA),

codified at Ark. Code Ann. §§ 9-19-101 *et seq.*  "One of the purposes of the UCCJEA is to avoid

relitigation of child-custody determinations in other states."  *Arkansas Dep't of Human Services v.*

*Cox*, 349 Ark. 205, 215, 82 S. W. 3d 806 (2002).  Under the UCCJEA, an out-of-state child-custody

determination may be registered in this state.  Ark. Code Ann. § 9-19-305.  Section 9-19-305

-15-

provides that a "registered determination is enforceable as of the date of registration in the same manner as a determination issued by a court of this State." *Id.*

In this case, there is no evidence Browning sought the assistance of Movants in obtaining the custody of Makayla.  On the contrary, the undisputed evidence is that Plaintiffs traveled into the State of Arkansas and removed Makayla from a daycare facility without the assistance of law enforcement and without establishing their entitlement to custody of Makayla.   Even if the Court assumes Norris knew of the existence of the prior Kentucky state court order, granting custody to the Plaintiffs, before he completed the affidavit of probable cause, this fact does not alter the undisputed material facts which occurred on May 22-23.   The order entered by the Garland County Circuit Court was dated after the date of the Kentucky court order and granted permanent custody of Makayla to Browning.   There was nothing on the face of the Garland County court order or anything in any of the statements obtained from the witnesses to suggest the Garland County Circuit Court order was invalid.  As the Arkansas Supreme Court has noted, "[e]nforcement of foreign child-custody determinations is not a self-help process."   *Arkansas Dep't of Human Services v. Cox*, 349 Ark. 205, 219, 82 S. W. 3d 806 (2002)(also noting that under the UCCJEA an order from another state court cannot be given full faith and credit unless it has been registered).   Stripped to its bare essentials, Plaintiffs seek to hold Norris liable for (1) failing to give a Kentucky state court order, that they did not present to Kindercare, Norris, or  the Arkansas court, full faith and credit; and (2) for Norris' failure to question the facial validity of the Garland County Circuit Court order.

Plaintiffs also suggest Norris failed to follow the Police Department's own policy of  non-intervention in child custody disputes. *See Plaintiffs' Exhibit* 17.  Plaintiffs point out that the policy provides that when "officers are faced with two orders, one from Garland County and one from

another jurisdiction, officers shall contact the Garland County judge who signed the local order before taking any action.  If the judge who signed the local order is not available, the officer shall contact any Garland County Chancery or Probate Judge and discuss the situation before taking action." *Id.*  Plaintiffs maintain Norris' conduct violated this policy.  Even if the court assumes Norris' conduct violated this policy, a violation of departmental policy is not the equivalent of a constitutional violation and thus does not support a § 1983 claim.  *See e.g., Neal v. St. Louis County Board of Police Commissioners*, 217 F.3d 955, 959 (8th Cir. 2000)("Police department guidelines and policies do not create constitutional rights.").

With respect to Gary Ashcraft and the City of Hot Springs, Movants point out Ashcraft had no involvement in the investigation at Kindercare, the preparation of the probable cause affidavit, or any other involvement in the events alleged by the Plaintiffs.  An official capacity claim against Chief Ashcraft is the equivalent of a suit against the City of Hot Springs.  *See e.g., Grayson v. Ross*, 454 F.3d 802, 810 (8th Cir. 2006).  "'[A governmental entity] may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional . . . policy or custom.'"  *Reasonover v. St. Louis County*, 447 F.3d 569, 582 (8th Cir. 2006) (*quoting Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)).  *See also Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  "To establish liability, [the Plaintiffs] must prove a . . . custom or policy was the moving force behind the constitutional violation." *Reasonover*, 447 F.3d at 583.  "A supervisor is not vicariously liable under [§ 1983] for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994).  *See also Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990)(supervisors are not liable for claims brought under §

-17-

1983 on respondeat superior theory; supervisors must be personally involved in, deliberately indifferent to, or tacitly authorize constitutional violation).

On the undisputed facts of this case, there is simply no basis on which Ashcraft or the City of Hot Springs can be held liable. There is no genuine issue of material fact as to whether a municipal policy or custom was the moving force behind the alleged violation of Plaintiffs' constitutional violation. The Plaintiffs have alleged no such policy or custom. With respect to the Plaintiffs' argument that the warrants remained active in the ACIC/NCIC databases until August of 2003, Plaintiffs' own exhibits demonstrate that warrant deletion forms were completed when the warrants were served on June 12, 2002. Nothing suggests there is any possible basis on which Ashcraft or the City of Hot Springs can be held responsible for the alleged failure of the warrants to be properly deleted from the computer databases. The § 1983 claim should be dismissed with prejudice.

**B.  Section 1985**:  To establish a conspiracy to interfere with civil rights, Plaintiffs must show:  (1) a conspiracy; (2) motivated by racial or other discriminatory animus; (3) for the purpose of depriving any person or a class of persons of the equal protection of privileges and immunities under the law; (4) an overt act in furtherance of the conspiracy; and (5) injury. *E.g., Griffin v. Breckenridge*, 403 U.S. 88, 102-03, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971).

Plaintiffs' claim fails for a number of reasons. First, there is no genuine issue of material fact as to whether some racial, or otherwise class-based, invidiously discriminatory animus lay behind Movants' actions. *See e.g., Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993). There is nothing to suggest Norris' actions were based on the

Plaintiffs' race, or the fact that they possessed an out-of-state custody order, or that they had openly opposed their false arrest and imprisonment, *see Amended Complaint* (Doc. 222) at ¶ 51.

Second, there is no genuine issue of fact as to the existence of a meeting of the minds among the alleged conspirators. *See e.g., Rogers v. Bruntrager*, 841 F.2d 853, 856 (8th Cir. 1988)(conspiracy claim requires evidence of specific facts that show a meeting of the minds). A conspiracy allegation requires more than mere speculation. *See e.g., Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1997)(conspiracy claim requires more than speculation and conjecture).

Third, the Eighth Circuit has extended the intra-corporate conspiracy doctrine to claims brought under § 1985(3). *See e.g., Meyers v. Starke*, 420 F.3d 738, 742 (8th Cir. 2005)(any conspiracy claim is barred under the intra-corporate conspiracy claim that allows corporate agents acting within the scope of their employment to be shielded from constituting a conspiracy under § 1983–doctrine has been extended to governmental entities); *Runs After v. United States*, 766 F.2d 347 (8th Cir. 1985)(members of a Tribal Council cannot conspire with themselves). Application of this doctrine holds that when the defendants are all members of the same governing body they cannot conspire among themselves. *Id.* The § 1985 claim should be dismissed with prejudice.

**C. Malicious Prosecution[4]:**  To prevail on a claim of malicious prosecution a plaintiff must establish the following: (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages. *See e.g., South Arkansas*

---

[4]Movants request that Plaintiff's state law claims be remanded to state court pursuant to 28 U.S.C. § 1367(c)(3). After review of the Amended Complaint in this matter and the affidavits and exhibits provided by both the Plaintiffs and the Movants, the Court believes that Summary Judgment is proper for Plaintiffs's state law claims as well and will address those claims in this Report and Recommendation.

*Petroleum Co. v. Schiesser*, 343 Ark. 492, 495, 36 S. W. 3d 317 (2001); *Wal-Mart Stores, Inc. v. Yarbrough*, 284 Ark. 345, 349, 681 S. W. 2d 359 (1984).

In *South Arkansas Petroleum*, the Arkansas Supreme Court discussed the concept of probable cause in the context of a malicious prosecution case, it said:

> the existence of probable cause is to be determined by the facts and circumstances surrounding the commencement and continuation of the legal proceedings. Probable cause for prosecution must be based upon the existence of facts or credible information that would induce a person of ordinary caution to believe the accused person to be guilty of the crime for which she is charged. Ordinary caution is a standard of reasonableness, which presents an issue for the jury when the proof is in dispute or subject to different interpretations.

> Thus, only when the facts relied upon to establish probable cause are *undisputed* does the question of the existence of probable cause become a question of law for the courts.

*South Arkansas Petroleum*, 343 Ark. at 498.

Movants contend they are entitled to summary judgment on the malicious prosecution claim because a judge issued the arrests warrants based on his independent finding that probable cause existed for the issuance of the warrants. Movants contend this finding precludes the malicious prosecution claim. I disagree. In fact, the Arkansas Supreme Court in *South Arkansas Petroleum* rejected a very similar argument. In that case, the argument was made that probable cause was established as a matter of law when the trial court denied Schiesser's motion for directed verdict at the end of the State's case and at the close of all the evidence. *South Arkansas Petroleum*, 343 Ark. at 498.

I do, however, agree the Movants are entitled to summary judgment on this claim. The issue of "probable cause may be decided as a matter of law on summary judgment only if both the facts relied upon to create probable cause and the reasonable inferences to be drawn from the facts are undisputed." *Wal-Mart Stores, Inc. v. Yarbrough*, 284 Ark. 345, 681 S.W.2d 359 (1984). In this case,

-20-

as noted above, the undisputed facts are that Plaintiffs removed a minor child from a daycare facility in Arkansas without first establishing the lawful authority to do so.  Although Plaintiffs disagree with the statements given by the witnesses, it is undisputed members of the Hot Springs Police Department were called to the scene, witness statements were taken and the witness statements indicated the existence of facts that would induce a person of ordinary caution to believe the Plaintiffs were guilty of the crimes they were charged with.   Plaintiff does not dispute that Norris relied on the statements of the witnesses in preparing the probable cause affidavit.    Likewise Plaintiff does not dispute that Norris was provided with a facially valid order of the Garland County Circuit Court granting custody to Browning.   I conclude there are no genuine issues of fact as to whether there was probable cause to commence the legal proceedings against the Plaintiffs.

Moreover, under the facts of this case, I do not believe there are genuine issues of material fact as to whether Movants continued the legal proceedings without probable cause.  Plaintiffs' own exhibits establish that following Plaintiffs' arrest, on June 12, 2002, Norris requested the deletion of the warrant information from the ACIC/NCIC databases.  *Plaintiffs' Exhibit* 5.  Plaintiffs' claim of malicious prosecution should be dismissed with prejudice.

**D. Intentional Infliction of Emotional Distress:**  Arkansas recognizes a cause of action for the intentional infliction of emotional distress often referred to as the tort of outrage.  *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W. 2d 681 (1980).  The essential elements of this cause of action are: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional

-21-

distress sustained was so severe that no reasonable person could be expected to ensure it. *Crockett v. Essex*, 341 Ark. 558, 19 S. W. 3d 585 (2000).

The Arkansas courts have consistently given a narrow view to the tort of outrage and have indicated clear-cut proof is necessary to establish the elements. *Croom v. Younts*, 323 Ark. 95, 913 S. W. 2d 283 (1996). The courts have said that this cause of action was not intended to provide a remedy for every slight insult or indignity one must endure. *Miller v. Kroger Co.,* 82 Ark. App. 281, 105 S. W. 3d 789 (2003). Nevertheless, the type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Crockett v. Essex*, 341 Ark. 558, 19 S. W. 3d 585 (2000). Additionally, it has been recognized that "in some cases the existence of a special relationship between the parties can justify a finding of outrage where 'the gist of the claim arose out of the violation of that relationship. . . . .'" *Allen v. Allison*, 356 Ark. 403, 417, 155 S. W. 3d 682 (2004)(*quoting McQuay v. Guntharp*, 331 Ark. 466, 474, 963 S. W. 2d 583 (1998)).

The Movants maintain the Plaintiffs' claim falls well short of stating a viable claim for the tort of outrage. I agree. As stated above to prevail on a state law claim of outrage the Plaintiff must establish the following: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained was so severe that no reasonable person could be expected to ensure it. The Arkansas courts have not frequently found conduct sufficiently egregious to establish the tort of outrage. Without restating the facts discussed above, it is readily apparent in this case the Plaintiffs have offered no facts which establish any of the required elements for a claim of outrage. Norris's

conduct was not "extreme and outrageous" but rather entirely in keeping with his duties as a police officer.   He reviewed the reports of a fellow officer.   He interviewed one of the witnesses himself. He reviewed the state court's file containing an order granting custody to Browning rather than the Plaintiffs.   He reduced his investigation to an affidavit for probable cause.   He did not include false or misleading statements in the affidavit.   He presented the affidavit to a state judge and requested a warrant.   I believe the conduct the Plaintiffs allege occurred in this case falls far short of establishing this cause of action.   Plaintiff's claim of outrage should be dismissed with prejudice.

     **E.  Abuse of Process**:  In *Wal-Mart Stores, Inc. v. Binns,* 341 Ark. 157, 15 S.W.3d 320 (2000), the Arkansas Supreme Court discussed the tort of abuse of process.   It said:

> In order to prove the tort of abuse of process, a plaintiff must establish the following elements:  (1) a legal procedure set in motion in proper form, even with probable cause, and even with ultimate success, but (2) perverted to accomplish an ulterior purpose for which it was not designed, and (3) a willful act in the use of process not proper in the regular conduct of the proceeding.   *Union Nat. Bank of Little Rock v. Kutait,* 312 Ark. 14, 16, 846 S.W.2d 652, 654 (1993).   The key to an abuse-of-process claim is improper use of process after issuance, even when issuance has been properly obtained.   *Id.*  As distinguished from malicious prosecution, abuse of process "is somewhat in the nature of extortion or coercion."  *Id.*

*Binns*, 341 Ark. at 161-62.   "Judicial process has been defined as a comprehensive term which includes all writs, rules, orders, executions, warrants, or mandates issued by a court during the progress of a cause of action."  *Carmical v. McAfee*, 68 Ark. App. 313, 328, 7 S.W.3d 350 (1999).

     The Arkansas courts have said "[t]he key to recognition of abuse of process is the improper use of process after its issuance in order to accomplish a purpose for which the process was not designed."  *Id.*, 68 Ark. App. at 328 (citation omitted).   The classic example of an abuse of process is the use of criminal prosecution to extort the payment of money or the recovery of property. "Examples of misuse of process that have been found to constitute the tort of abuse of process are

the service of an arrest warrant; delivery of an order to a sheriff for execution; personal service procured by fraud; or attachment or garnishment for a greatly excessive amount." *Id.*, 68 Ark. App. at 328 (citations omitted). Other examples include: "wilful and malicious arrest of plaintiff when his innocense is known; . . . [and] vexatious and oppressive suits in a foreign jurisdiction." *Farm Service Co-Op, Inc., v. Goshen Farms, Inc.*, 267 Ark. 324, 337, 590 S.W.2d 861 (1979).

Plaintiffs' maintain Movants' conduct amounts to an abuse of process because the Movants failed to recognize the validity of the custody order Plaintiffs had obtained in Kentucky. I disagree. As discussed above, Movants merely reacted to the "self-help" mechanism utilized by the Plaintiffs to obtain custody of Makayla. Plaintiffs did not attempt to utilize the registration procedure of the UCCJEA. Movant's did not abuse any judicial or legal process in their cnoduct of investigating the incident at the Kindercare daycare facility. Plaintiff's claim of abuse of process should be dismissed with prejudice.

**F. Libel**: The elements of a cause of action for defamation, whether by slander or libel are: "(1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damage." *Northport Health Services, Inc. v. Owens*, 356 Ark. 630, 641, 158 S. W. 3d 164 (2004).[5]

Arkansas has long recognized a privilege for statements given to the police related to the prosecution of an individual. *See e.g., Routh Wrecker Service Inc. v. Washington*, 335 Ark. 232, 980 S. W. 2d 240 (1998). The privilege extends to communications preliminary to a proposed judicial proceeding or in the institution of a judicial proceeding. *Id.*, 335 Ark. at 243. The privilege has been

---

[5]The slander claim was previously dismissed on statute of limitations grounds.

extended to statements given to police even when the complaining witness may have been mistaken about what he or she observed.  *See e.g., Miller v. Kroger Co.*, 82 ark. App. 281, 290, 105 S. W. 3d 789 (2003).  The privilege not only extends to those reporting the crime but to the public officials in the performance of their official duties.  *See e.g., Saxton v. Arkansas Gazette Co.*, 264 Ark. 133, 569 S. W. 2d 115 (1978)(legislators, judges, administrative and executive officials possess absolute immunity against liability for defamatory words spoken in connection with their public duties).

In this case, Plaintiffs allege the Movants made defamatory statements in the arrest report, the probable cause affidavit, and caused news articles to be published indicating the police department was seeking information about the Plaintiffs in connection with the alleged abduction of Makayla from a daycare center as well as battery and assault charges stemming from allegations that Plaintiffs had shoved a daycare worked and rammed a car in the parking lot.

In short, the Plaintiffs seek to hold Movants liable for allegedly defamatory statements made in the performance of their official duties.  There are no genuine issues of material fact as to whether the Movants acted outside the scope of their duties or acted with malice.  For the reasons stated, I believe the Movants are absolutely immune from civil suit for the alleged defamatory statements. *See e.g., Carradine v. State*, 511 N. W. 2d 733 (Minn. 1994)(Trooper Chase is absolutely immune from liability for alleged defamatory statements made in a police report.  A key part of an officer's job is to prepare a written report that is used in determine whether to charge the suspect).  Plaintiffs' defamation claim should be dismissed with prejudice.

## RECOMMENDATION

Accordingly, I recommend that the Movants' Motion for Summary Judgment (Doc. 279) be **GRANTED** and all claims against Paul Norris, Gary Ashcraft, and the City of Hot Springs be dismissed with prejudice.

**The parties have ten days from receipt of this report and recommendations to file objections to the same pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

**DATED** this **17th day of April 2007.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

-26-